```
1                        P R O C E E D I N G S
2              (The following proceedings were held in open court
3      before the Honorable Reginald C. Lindsay, United States
4      District Judge, United States District Court, District of
5      Massachusetts, at the John J. Moakley United States Courthouse,
6      1 Courthouse, Way, Boston, Massachusetts, on February 10, 2003.
7              The defendant, Marino Nunez, is present with counsel.
8      The Assistant United States Attorney is present.)
9                   THE CLERK:  This is case number 01-10260, United
10     States v. Marino Nunez.
11                  Would the interpreter please rise to be sworn?
12                  (Interpreter sworn by the clerk.)
13                  THE CLERK:  Counsel please identify themselves.
14                  MR. PELGRO:  Michael Pelgro on behalf of the
15     government.
16                  MR. BARONE:  Theodore Barone on behalf of the
17     defendant, Marino Nunez.
18                  THE COURT:  Thank you very much.  We're here this
19     afternoon for the disposition of the matter of United States of
20     America v. Marino Nunez.  Mr. Nunez on September 17, 2002
21     pleaded guilty to an indictment that charged him in count one
22     with conspiracy to possess with intent to distribute and the
23     distribution of heroin; and in counts two, three, and four with
24     distribution of heroin; count five, possession of heroin with
25     intention to distribute.
```

1              Mr. Pelgro, have you seen the presentence report?

2              MR. BARONE:  Yes, your Honor.

3              THE COURT:  Mr. Barone, have you seen the

4    presentence report?

5              MR. BARONE:  I have, your Honor.

6              THE COURT:  Have you discussed it with Mr. Nunez?

7              MR. BARONE:  Yes, I have.

8              THE COURT:  I understand there are some

9    controversial issues having to do with the offense level

10   computation.  Let me then start with the computation as set

11   forth by the probation officer, then I'll deal with any

12   objections to that computation.

13             First of all, the guideline calculation has been

14   made in accordance with the manual issued by the sentencing

15   commission on November 1, 2002.  In accordance with that manual

16   the counts of conviction, the five counts of conviction are

17   grouped together, and as a result of the grouping the probation

18   officer has determined that the defendant, Mr. Nunez, is to be

19   held accountable for a total of 957.9 grams of heroin as

20   follows:  19.8 grams with respect to the matter of April 5,

21   2001, 28.98 grams with respect to the matter discussed in the

22   presentence report on April 11, 2001, 39.3 grams for the matter

23   discussed -- for the incident that occurred on May 4, 2001 and

24   discussed in the presentence report, 497 grams ceased on May

25   30, 2001, and 272 grams transported by CW-1 and 100 grams

1   transported by codefendant Tejeda.

2           Accountability for 957.9 grams of heroin produces a

3   base offense level of 30.  The probation officer has adjusted

4   that level upward by four levels because, in her calculation,

5   the defendant was -- her reckoning that the defendant was an

6   organizer, leader of criminal activity that involved five or

7   more participants or was otherwise extensive.  That produces an

8   adjusted offense level of 34.

9           The defendant was granted a three-level downward

10  adjustment for acceptance of responsibility, resulting in total

11  offense level of 31.

12          There are objections, first, to the weight of the

13  substance involved, and then I believe the defendant has an

14  objection to the role adjustment as well; is that right,

15  Mr. Barone?

16          MR. BARONE:  That is, your Honor.

17          THE COURT:  Do you want to speak to either of those

18  now?

19          MR. BARONE:  Yes, I would.  With respect to the

20  drug weight, if you will, I would respectfully suggest that the

21  government, actually, in their brief outlines very good reasons

22  as to why the base -- strike that -- the drug weight should be

23  between 400 and 700 grams as opposed to the 957 that probation

24  attributes to this particular situation.

25          Number one, and probably most importantly, the

1  government has indicated in its brief -- and I suspect that

2  Mr. Pelgro will indicate in open court here -- that CW-1,

3  the government has its doubts as to the credibility with

4  respect to CW-1.  CW-1 is not here for me to put forth any

5  cross-examination questions or to test -- I believe it's a

6  her -- test her credibility, and the government, frankly, is

7  simply not convinced with respect to the reliability of the

8  information produced by CW-1 relative to drug weight.

9         I believe -- I would concur with that presentation

10  and that indication, and I think Mr. Pelgro will -- I'm sure

11  he'll correct me if I've misstated anything -- but I think

12  generally he agrees with that statement.

13         Secondly, Ms. Tejeda's 100 grams, even if the Court

14  deems that would be reliable, I don't think that takes it out

15  of the 400 to 700 category; and, therefore, for those reasons,

16  plus the fact that, you know, we're talking about situations

17  where neither of those witnesses are here to make a

18  presentation to the Court and to give me an opportunity to

19  cross-examine, I would respectfully ask your Honor to please

20  allow the -- or agree that the base offense level is 28, as

21  we've agreed in our plea agreement, and that the drug weight is

22  between 400 and 700 grams.

23         THE COURT:  All right.  Do you want to speak to the

24  role?

25         MR. BARONE:  Yes, I certainly would.

1          With respect to the role in the offense, your

2     Honor, I know the government is asking for four -- a four-point

3     bump up or a four-point enhancement, I guess is the better way

4     to put it, relative to the role in the offense based upon

5     3B1.1, and they have indicated that the defendant was an

6     organizer or leader of criminal activity that involved five or

7     more participants or was otherwise extensive.  I would oppose

8     that.  I would ask that your Honor do not find that he

9     committed an aggravating role.

10          As I read the government's version of offense

11     conduct that's set forth in the presentence report, I would

12     respectfully suggest that what Mr. Nunez basically is with

13     respect to this conspiracy that he's pled to is a soldier who

14     conspires sort of on a case-by-case kind of basis individually

15     with Ms. Tejeda on the May transaction, the approximate

16     500-gram transaction with Mr. Guaba on the -- I believe the

17     second transaction, which would be the April 11, 2001

18     transaction for 30 grams.

19          With respect to the individual named Felix, who was

20     never taken into custody, as far as the April 5th transaction,

21     and the individual named Hector Figueroa Borrero with respect

22     to the May 4, 2001 transaction, I would respectfully suggest

23     that looking at the facts as presented in the presentence

24     report by the government's role and the offense that their --

25     the indication it is just as plausible and just as credible and

1    believable that they, in essence, took over those transactions,

2    actually took over whatever role there might be towards

3    leadership whatsoever.

4            I would further indicate that with respect to the

5    largest of the transactions; that is, the May 30, 2001 in which

6    497 grams were seized and Mr. Nunez, my client, and Ms. Tejeda

7    were both arrested at that particular point in time, I would

8    respectfully suggest that a leader or organizer of a conspiracy

9    that the government alleges occurred here would not be the

10   individual who is actually delivering that large quantity of

11   heroin with all its attended risks.  And I would respectfully

12   suggest that it is because of that that my client -- the

13   four-point enhancement, for those reasons that it should not be

14   allowed.

15           The government -- if your Honor disagrees with

16   that, however, I would respectfully suggest that the

17   alternative is that -- the appropriate alternative would be

18   either a two-point or a three-point enhancement with respect to

19   manager or supervisor if your Honor disagrees with the -- or

20   determines that there should be an enhancement whatsoever with

21   respect to an aggravating role.

22           As far as any argument that may be made under the

23   case law that some of the people who may have been,

24   quote-unquote, unknowing participants, I know that my review of

25   the government's version of the offense conduct indicates an

1    individual named Suarez, a man, and his significant other named

2    Vizcaino.  They may be pointing to that with respect to the

3    fact that it is alleged that my client asked Suarez to register

4    a vehicle and Vizcaino to insure a vehicle, and the reason

5    being given is because of poor credit situation, or at least

6    that was one of the reasons.  I would respectfully suggest that

7    there's really that kind of conduct, if you will, or alleged

8    conduct, if you will, goes into the -- goes into the legitimate

9    mode.  There's no indication that there was any check by the

10   government, by the authorities with respect to my client's

11   credit rating or situation at that particular time.  At least

12   as far as I read the offense conduct.

13        So for all those reasons, your Honor, and most

14   especially the fact that my client's position of delivering the

15   largest quantity would appear that he is a foot soldier, if you

16   will, and not a leader or an organizer of criminal activity

17   that involves five or more or whose conduct is otherwise

18   extensive.  However, if you disagree, I would respectfully

19   suggest that he was rather a manager or supervisor, if you

20   disagree, and that the enhancement should be two points or at

21   the very maximum three points on that particular issue.

22        THE COURT:  What do you say about the -- about that

23   part of the --

24        MR. PELGRO:  Are you asking me, your Honor?

25        THE COURT:  No, I'm asking him.  What do you say

1    about that part of the presentence report that indicates that

2    Mr. Nunez was selling uncut heroin and that uncut heroin -- the

3    sale of uncut heroin indicates somebody high up in the chain of

4    distribution?

5           MR. BARONE:  Well, I understand the inference that

6    the government and I guess probation intend to make with

7    respect to the quality of heroin issue.  I don't think that --

8    I would respectfully also suggest, your Honor, that that does

9    not take away from the argument that puts Mr. Nunez in the

10   position of foot soldier.  All it does is it may put him in the

11   position of trusted foot soldier by someone who is -- who is

12   the leader or organizer.  Simply because he is given, that is,

13   Mr. Nunez, the directive with respect to heroin that is purer

14   or uncut doesn't take him -- the quality of the product, I

15   would respectfully suggest, does not necessarily cut one way or

16   another.  It certainly wouldn't take him out of the foot

17   soldier.  One may conclude, all right, maybe he was a trusted

18   foot soldier, maybe he had done, you know, because of other

19   reasons that, you know, the actual leader or organizer might be

20   in a position of trust towards Marino Nunez; but that doesn't

21   make him the leader or organizer simply because it was good

22   quality, at least at the beginning.

23          My recollection, however, unless I am incorrect, my

24   recollection with respect to the largest -- a larger amount is

25   that it was not of that same significant quality.

1          THE COURT:  Okay.  Thank you very much.

2   Mr. Pelgro?

3          MR. PELGRO:  Your Honor, in connection with the

4   drug quantity issue, as set forth in the government's

5   sentencing memorandum, the government has agreed that the more

6   appropriate estimate of the drugs to be attributed to the

7   defendant are 400 to 700 grams of heroin, which is base offense

8   level 28.  I've set forth in the memorandum the government's

9   reasoning behind that.  Essentially, if you want to tie it into

10  the presentence report, basically the government views

11  paragraph 82 E as -- the government feels there's a question

12  concerning the reliability of the estimate that's been put

13  forth in that paragraph.  You'll see that 82 E is the section

14  that deals with information provided by CW-1, and really it is

15  drawn from -- although it doesn't say it -- it's drawn from

16  paragraph 16, essentially, which is where the narrative of the

17  CW's information is.  And you'll notice if you go to paragraph

18  16 there's no quantities mentioned by CW-1 in her debriefing as

19  to her own trips that she took to New York.  There's a mention

20  of dollar figures that she brought back to the source in New

21  York, but there's no mention of the specific quantity, which

22  is -- which is consistent with what she said, in terms of being

23  unable to say how much was brought back.

24          So the government's belief is -- it's provided the

25  information for the Court and for probation to evaluate;

1   however, the government feels that, frankly, it's -- the

2   reliability of calling it 272 grams, the specific number that

3   way, is somewhat -- is, frankly, not reliable.  In addition,

4   your Honor, if we were to have an evidentiary hearing on that

5   issue, as I pointed out in the sentencing memorandum, the

6   government would be unable to produce CW-1, because DEA has

7   lost contact with CW-1.

8           So the government agrees with everything probation

9   has done in paragraph 82, but feels the 400 to 700 gram

10  estimate captures the provable relevant conduct.  In other

11  words, what DEA purchased from the defendant is well less than

12  700 grams, and the government feels that taking it up to 700

13  grams captures that relevant conduct.  I understand that's

14  probably a very conservative estimate, but that's the position

15  the government finds itself in in this particular case.

16          THE COURT:  All right.

17          MR. PELGRO:  In connection with role in offense,

18  your Honor, as set forth in the sentencing memorandum, the

19  government's position is in agreement with probation that a

20  four-level enhancement is clearly warranted for this activity.

21          The undisputed facts show that in connection with

22  each deal the defendant had a subordinate who was the person

23  who actually delivered the heroin.  If you look at the very

24  first transaction that occurred on April 5, 2001, the defendant

25  initially had to meet the person who was purchasing the heroin,

1   that is CW-2, the person identified as CW-2 in the presentence

2   report.  The defendant had to meet that person and in effect

3   okay him as a purchaser of heroin.  Then the defendant left the

4   area, then the person named Felix crossed the street and

5   consummated the sale.

6         If you look at the subsequent transactions on April

7   11th, the defendant has his other subordinate, Julio Guaba,

8   bring the heroin from Lynn to Boston so that the transaction

9   can take place.  Then it's Guaba who has the heroin on his

10  person and delivers it to CW-2 on May 4th.  Again, it's the

11  person identified as Borrero who has the heroin and makes the

12  delivery, the government would submit, at the direction of the

13  defendant.

14        In connection with May 30th, we're in a different

15  ballpark with regard to that.  The quantity is much, much

16  higher.  The amount of money the defendant expected to receive,

17  $42,000, is much, much higher, and I would suggest that is the

18  reason why the defendant took more of a hands-on role in that

19  particular transaction.  But even as to that, Ms. Tejeda

20  profited and the undisputed facts showed that she was used as a

21  courier to go to New York to obtain the heroin and she used

22  this particular heroin that was to be sold on this date.  At

23  the defendant's direction she held it in her apartment

24  overnight.  At the defendant's direction when he told her on

25  the phone she brought the heroin out, and she was riding to the

1    sale hoping to make $800 that the defendant promised her, out

2    of the $42,000 that he was going to get.  So clearly he was

3    getting the lion's share of the proceeds of this operation.

4            There are clearly five or more participants, the

5    people I just named count five if you count the defendant.

6    You've got the defendant, Felix, Julio Guaba, the person named

7    Borrero and Ms. Tejeda.

8            With regard to the drug purity issue, your Honor, I

9    believe there is a case that talks about the fact that drug

10   purity is a factor that shows one is higher up in the chain of

11   distribution; and I wish I could remember the name of that

12   case, but I can't right now.  However, the sentencing

13   commission also factors that in.  If you look at section 2D1.1,

14   application note nine, it says the purity of the controlled

15   substance, particularly in the case of heroin -- which is what

16   we have here -- may be relevant in the sentencing process

17   because it is probative of the defendant's role or a position

18   in the chain of distribution since controlled substances are

19   often diluted and combined with other substances as they pass

20   down the chain of distribution.  The fact that a defendant is

21   in possession of unusually pure narcotics may indicate a

22   prominent role in the criminal enterprise in proximity to the

23   source of the drugs.

24           In this particular case, we've got purities over 90

25   percent.  I would suggest to you that is clearly an unusually

1    pure form of the drug considering this is heroin.

2           So I would suggest, your Honor, on the undisputed

3    fact of what happened, how the transactions were carried out

4    plus the purity of the drug, the defendant is clearly warranted

5    in receiving the four-level role enhancement, as probation has

6    found.  He clearly organized these sales.  He organized the

7    logistics, he orchestrated them, and he exercised control.  I

8    would suggest he's both a leader and an organizer in this

9    conspiracy.  So the government's position is that he should get

10   the four-level role enhancement, and unless the Court wants to

11   hear me on the downward departure issue --

12          THE COURT:  I'll hear you later on that.

13          All right.  I'm going -- I find that the -- by a

14   preponderance of the evidence that the quantity of heroin is

15   between 400 and 700 grams, and in making that finding I

16   disagree with the calculation made by probation.

17          On the other hand, I agree with probation that

18   Mr. Nunez -- the guideline calculation should be enhanced by

19   four levels, because he was an organizer of an enterprise

20   consisting of at least five people or that was otherwise

21   extensive.  First of all, as Mr. Pelgro says, he organized the

22   logistics of these transactions; and in each transaction he

23   directed some other person.  Third, his position -- the

24   evidence that he was dealing with uncut heroin leads me to

25   conclude that he was higher up in the hierarchy; and, finally,

1    I have relied on the fact that he received a larger share of

2    the proceeds from that large transaction in which both he and

3    Ms. Tejeda were involved.  The five people, the at least five

4    people whose activities he directed included a person named

5    Felix, Julio Guava, Tejeda, Hector Figueroa Borrero and the

6    defendant himself.  So I think the four-level enhancement is

7    appropriate.  That makes the total offense level 29.

8           The probation officer has determined that Mr. Nunez

9    should -- has five criminal history points based on the

10    criminal history score as enhanced under the guidelines.  Total

11    criminal history points five results in a criminal history

12    category three.  Any objection to the criminal history

13    category?

14           MR. PELGRO:  Not from the government, your Honor.

15           MR. BARONE:  I stand silent on that issue, your

16    Honor.

17           THE COURT:  All right.  With a total offense level

18    29 and criminal history category -- first with respect to count

19    one, count one there's a minimum five years, so the offense

20    level being calculated with counts two, three, and five.  I

21    guess counts one and five have minimum mandatory, and counts

22    two, three, and four are guideline calculations.  With total

23    offense level 29 and criminal history category three what do we

24    get?

25           PROBATION OFFICER:  108 to 135 months.

1              THE COURT:  And the fine range is --

2              PROBATION OFFICER: Fine range is $15,000 to $7

3    million.

4              THE COURT:  And the special assessment remains the

5    same.  How about the guideline range for supervised release?

6              PROBATION OFFICER: Is four to five years.

7              THE COURT:  Any objection to these ranges,

8    Mr. Pelgro?

9              MR. PELGRO:  No, your Honor.

10             THE COURT:  Mr. Barone?

11             MR. BARONE:  Other than what has already been

12   argued and motion for downward departure, no, your Honor.

13             THE COURT:  Okay.  All right.  Then I'll hear you

14   on the downward departure.

15             MR. BARONE:  Your Honor, the motion for downward

16   departure speaks to Mr. Nunez' status as a deportable alien.

17   It appears that the case law in this particular circuit has

18   left the question open.  The cases that have been cited in my

19   motion and at least partially cited in Mr. -- also cited in

20   Mr. Pelgro's sentencing memorandum, as well as other cases, I

21   don't believe speaks to the whole of it.

22             The status of an individual as a deportable alien,

23   as I say in my motion, really puts him in a position of once he

24   finishes his sentence, whatever sentence this Court metes out

25   to him, he will be taken -- because of his status as a

1    non-citizen, if you will, he will be taken into INS custody and

2    held in INS custody in a much similar fashion as he is today,

3    and for a period of time that is totally uncertain, depending

4    upon how long it may take for deportation proceedings to ensue

5    and be completed.

6         The great difficulty is my understanding -- and I

7    got most if not all of my information from an immigration and

8    naturalization or immigration expert named Anthony Drego -- I

9    mentioned my consultation with a specialist in immigration

10   law.  He's here in the second row in the gray suit, Mr. Drego

11   is, and he's handled literally hundreds and hundreds of these

12   cases involving individuals like Mr. Nunez, who's in custody

13   for a deportable offense from an aggravated felony, and this is

14   the normalized procedure.

15        I would respectfully suggest that the cases that

16   Mr. Pelgro cites that would indicate that it was not

17   appropriate for a downward departure, several of them had to do

18   with like, for instance, United States v. Vazquez, one of the

19   most recent cases, a 2002 case, that's cited both in my motion

20   and in Mr. Pelgro's, that with regard to an illegal reentry

21   case the principal reason why the Court in that case found that

22   it was not appropriate for a downward departure was because

23   they determined -- the Court determined that the sentencing

24   commission must have taken the immigration status into

25   consideration when -- and the collateral consequences with

 1    respect to that particular sentencing guideline; and,

 2    therefore, downward departure wasn't appropriate.

 3          We don't have that situation here, your Honor.  We

 4    have a drug case.  We have a drug case in which the -- as the

 5    Court in <u>United States v. Smith</u>, a DC circuit case from 1994,

 6    which I cite in my brief, and Mr. Pelgro -- strike that -- I

 7    cite that in my motion and Mr. Pelgro cites in his brief,

 8    indicates that, you know, if the -- it can be determined that

 9    defendant's status as a deportable alien is likely to cause a

10    fortuitous increase in the severity of his sentence it may be

11    an appropriate situation for an outside the heartland downward

12    departure.

13          I would respectfully suggest that increased

14    incarceration from anywhere from four to 14 months -- as the

15    information I've been given by Mr. Drego and as an officer of

16    the court I pass on to your Honor from a reliability

17    standpoint, which is what your Honor indicates in the order

18    that we were given is what you're looking at -- that is severe;

19    and that's a severe enhancement, if you will, from a sentencing

20    standpoint, an additional sentence, if you will, that is solely

21    there because of Mr. Nunez' status as a deportable alien and

22    for no other reason.

23          THE COURT:  Two questions.

24          MR. BARONE:  Sure.

25          THE COURT:  You think the sentencing commission was

1    unaware that someone who is an alien would not be deported if

2    convicted of an aggravated felony?  That's part one of my

3    question.

4              MR. BARONE:  Okay.

5              THE COURT:  Do you think they were unaware that

6    that consequence would flow from conviction of an alien?

7              MR. BARONE:  I'm not about to stand here before

8    your Honor and say that they were unaware.  Okay.

9              THE COURT:  Well, the second part of the question

10   is do you perceive that they were unaware of the procedure of

11   immigration and how long it takes to get somebody deported?

12   You don't know.

13             MR. BARONE:  That I don't know.

14             THE COURT:  That's a different -- more difficult

15   question.

16             MR. BARONE:  It is a much more difficult question,

17   and I think that the way your Honor has formulated the

18   questions is a very common sense approach to it, and I also

19   think that answering the first question as candidly as I can, I

20   suspect they were aware.  But I also suspect that they may not

21   have been aware or may not have taken into account the amount

22   of time in incarceration, in custodial incarceration that an

23   individual who is a deportable alien or has a status as a

24   deportable alien was going to spend after his sentence for the

25   baseline offense has been concluded.  Because -- sorry.

1          THE COURT:  I'm sorry.  Every now and then somebody

2     spends a great deal of time in pretrial custody that may be as

3     long as this defendant will spend in post conviction and post

4     sentence custody.  Do you see a difference between how much

5     time somebody might spend pretrial before sentence is imposed

6     and what may happen with this defendant if he goes in detention

7     after serving a sentence on the offense of conviction here?

8          MR. BARONE:  I do, your Honor.  There is a

9     difference.  There is what I think is a very clear difference.

10    The amount of time that an individual is incarcerated

11    pending -- or the outcome of his case generally speaking is

12    that kind of time that can be argued as time that should count

13    towards a sentence, and it's not extra time.

14          The time that an individual spends after being

15    taken into INS custody via INS detainer is, I would suggest,

16    extra time and extra, quote-unquote, dead time.  It is more

17    severe by it's very nature, and I would respectfully suggest

18    that the -- it's hard to use the word probable, but I would

19    suggest that from a review of the cases, even the cases that

20    Mr. Pelgro puts in his brief, it doesn't appear that it was

21    really taken into account, the extra time, if you will, by the

22    sentencing commission, and that's what I would suggest.  And it

23    is solely attributable to the fact that Mr. Nunez and others in

24    Mr. Nunez' position, that they're deportable aliens, that they

25    are aliens who, when convicted of an aggravated felony, have

1    this extra enhancement, if you will, this additional time, and

2    for no other reason.

3                THE COURT:  All right.  Now the final -- I guess

4    this is the last question.

5                This means that every -- this departure would mean

6    that every alien, every alien would get this departure.  Now,

7    the question is -- I have to conclude that the sentencing

8    commission in failing to consider this will allow a departure

9    in every case of an alien convicted of an aggravated felon.  Do

10   I not to have make that conclusion?

11               MR. BARONE:  Let me just take a step back for half

12   a second, your Honor, to think about that one.  I mean, I

13   had -- when I was preparing for this I hadn't thought that that

14   might come up, but as I'm standing here, I'm -- I would suggest

15   not necessarily, your Honor, and the reason is specifically

16   this:  That unless and until the sentencing commission has

17   an -- or had a better understanding of the categories of aliens

18   from whatever their country of origin may be, how much time

19   they are going to spend in additional incarceration, that the

20   answer to your question is no, not necessarily.

21               THE COURT:  Well, it doesn't make any difference or

22   does it make a difference to INS what, you know, what your

23   conviction has been?  Their problem has to do with the time it

24   takes to get someone deported, no matter what the circumstance.

25               MR. BARONE:  True enough, your Honor.

1    THE COURT:  So that I guess what I'm putting to you
2    is this:  If a departure is appropriate here, it's appropriate
3    in every case of an alien convicted of an aggravated felon.
4        MR. BARONE:  Not necessarily.  And the reason I say
5    that is this:  You know, if the Immigration and Naturalization
6    Service, if we had some sense as to how long a person from
7    Mr. Nunez' country of origin --
8        THE COURT:  Oh, I see.
9        MR. BARONE:  -- in the Dominican Republic.  In some
10    cases some countries take longer, some it's shorter.
11        THE COURT:  Well, at least he had -- even you would
12    conceive it would apply to every person from a particular
13    country, if I have a whole group of Dominicans, that the
14    departure would be appropriate for every Dominican.
15        MR. BARONE:  If it could be tied to an amount of
16    time that was unacceptable in terms of the waiting period, if
17    you will, that was beyond the bounds of reason.  For instance,
18    there's a case -- and I forget the name of the case -- where
19    it's indicated that -- I think the Supreme Court indicated --
20        THE COURT:  I know the case, I think, you're
21    talking about.
22        MR. BARONE:  I know one person --
23        THE COURT:  I think I know the point you're talking
24    about, but those -- I don't know that those were conviction
25    cases.  I think these were people who were just awaiting

1   deportation generally.

2           MR. BARONE:  But I think the point applies, your

3   Honor.  If you can get an individual deported, if you will,

4   who's been convicted of an aggravated felony within 90 days or

5   within a reasonable period of time, whatever is determined by

6   INS in line with the sentencing commission, then you might have

7   some certainty with respect to it.  As it stands now, you've

8   got nothing -- strike that -- I don't mean you, your Honor, but

9   I mean we all have nothing, no standard.  It is -- it's --

10  again, arbitrary may not be the right word, but it's pretty

11  close to arbitrary.  We just don't know.

12          My client could be sitting there an extra 14

13  months, and that's -- after he's already done the sentence that

14  your Honor metes out to him.  And there's no guideline out

15  there that gives the sentencing commission an understanding as

16  to what is reasonable from what is not reasonable.  And that's

17  why I would suggest my client in this day -- on this day and at

18  this time is entitled to a downward departure.  Someone else

19  after some promulgating guidelines as to what's reasonable and

20  what's not reasonable as to an INS detainer may not be, but we

21  don't have that.  We can't operate on that assumption right

22  now.

23          THE COURT:  Well, I just need to know -- and I

24  guess this is my last question.  The 14-month or whatever

25  period he remains in INS custody is not -- is not a function of

1  being convicted in this case.  It's a function of the time it

2  takes between now and getting him deported some place.  So that

3  it is -- my point is that this is not an incident of criminal

4  conviction, it's an incident of administration of the

5  immigration procedures.  So that --

6              MR. BARONE:  I'm sorry.

7              THE COURT:  Let me just finish.

8              MR. BARONE:  I apologize.

9              THE COURT:  So that somebody who is not convicted

10  of a felony would also spend 14 months in INS detention.

11              MR. BARONE:  I disagree from this standpoint:  I

12  think it is solely attributable at least on this day at this

13  time in our history attributable solely to his status of who he

14  is, and that is a deportable alien.  And the only reason -- not

15  the only reason, but the reason in this case that this

16  deportable alien is deportable is because of your Honor's

17  conviction -- strike that -- not your Honor's conviction, but

18  the conviction in this particular case.  I would suggest that

19  you can't -- I would say --

20              THE COURT:  Yes, but he might have come to the

21  United States illegally, he might have been found in the United

22  States and put in detention and it would still take 14 months

23  to send him back to the Dominican.

24              MR. BARONE:  That may be true, but in this case --

25  it sort of goes to your last question.  In this case on these

1  particular circumstances why he might be different than someone

2  else, such as the person whom your example is about.  That's --

3  it's all about his conviction here and his status.  That's what

4  triggers his wait.

5          The illegal entrant is a different set of

6  circumstances.  That person may not be entitled, especially

7  because the sentencing commission in those cases, Vazquez has

8  already talked about, you know, illegal entry cases.  We've

9  already --

10          THE COURT:  I'm not talking about illegal reentry,

11  I'm talking about a person -- I'll drop this after this -- a

12  person who simply enters the United States illegally and is

13  arrested by INS and held in INS detention.  He's committed no

14  crime other than coming -- the crime of coming here in the

15  first place.  He's not prosecuted for entering the country

16  illegally, he's -- but he is retained in INS detention until he

17  can be deported.  And I put it to you that that person will

18  spend 14 months as well, and that is because of his status as

19  an alien.

20          So the 14 months that may apply to a defendant is

21  not different from any other person who is an alien is really

22  my point.

23          MR. BARONE:  I hear what your Honor's indicates,

24  but I would still suggest that the sentencing commission, at

25  least from what I have seen of the law, has not taken it

1    into -- neither question, neither the example that your Honor

2    poses or Mr. Nunez' situation, and partly because of that and

3    partly -- and also, the other thing on your example, your

4    Honor, that particular person hasn't just spent a certain

5    amount of time in incarceration.

6            THE COURT:  That's because he presumably hasn't

7    committed another crime.

8            MR. BARONE:  Presumably.

9            THE COURT:  It's punishment for the crime is this

10   time in detention.

11           MR. BARONE:  There's no question the concepts work

12   together.  I just -- that is, the conviction and the deportable

13   alien status.  But it still does not take away from the

14   argument that it was not adequately considered by the

15   sentencing commission.

16           THE COURT:  Okay.  Thank you very much.

17           Mr. Pelgro?

18           MR. PELGRO:  Your Honor, I'm not going to belabor

19   the case law I set out in the presentence memorandum.  The

20   1st Circuit has rejected every attempt made to consider

21   deportable as a reason for downward departure.  Mr. Barone is

22   correct, it has not squarely focused on the issue --

23           THE COURT:  In fact, the last case, Vazquez,

24   simply -- they actually make a point of saying they're not

25   deciding that issue.

1              MR. PELGRO:  That's correct, your Honor.  However,

2    if you look at what they've done with this issue in general I

3    don't think it takes a fortune teller to figure out how they're

4    going to treat it once that case does come up to that level.

5              Other circuits have rejected it outright.  Even in

6    those cases, like Smith from the DC circuit in which they say,

7    well, it might be permissible under a certain set of factors.

8    They have said -- like the 1st Circuit has said, there has to

9    be something extraordinary or unusual to take -- to make this

10   case -- to take this case out of the heartland, which is, after

11   all, how departures are to be viewed in the first place.

12             Like your Honor said, every deportable alien would

13   be entitled to this type of departure if you accepted the

14   defendant's argument.  There's nothing about this specific case

15   that makes it extraordinary or unusual.  The defendant can't

16   even tell us how long he'll be in INS custody if in fact he

17   goes into INS custody.  So we don't know what the facts are in

18   this case.  And since it's the defendant's burden to produce

19   those facts and to prove those facts, I would suggest that goes

20   against him.

21             The defendant -- as I said in the memorandum, the

22   defendant himself is a determinant in how long he remains in

23   INS custody, because whether he contests it or admits to it;

24   that is, to deportation, will determine how long he remains in

25   INS custody.  So he himself plays a role in that calculation.

1          The other thing I would add, your Honor, is the

2   case law stresses that we have to look at the sentence the

3   defendant receives to determine even in those cases that say

4   deport -- his status as a deportable alien is an appropriate

5   factor under some set of circumstances, you have to look at the

6   sentence that he receives.  Everything Mr. Barone has said is

7   not something that flows from the sentence.  The sentence

8   remains the same whether he gets deported or doesn't get

9   deported.  Whether he goes into INS custody or doesn't go into

10   INS custody he's going to serve the same sentence.  So I would

11   say it's inappropriate to look at what might possibly happen

12   after he serves his sentence as a reason to reduce the sentence

13   that he's going to get.

14          The other thing I would add, your Honor, and this

15   comes across in the Smith case from the DC circuit, the

16   question is whether or not there's some excessive punishment;

17   that is, undeserved by the person as a reason for a downward

18   departure.  I would suggest coming to this country as an alien

19   and then selling heroin doesn't necessarily make it undeserved

20   that you would spend time in custody awaiting the United

21   States' decision to kick you out of the country for the crimes

22   that you've committed.

23          And, finally, your Honor, I would add in this

24   particular case it is particularly inappropriate, because, as I

25   pointed out in the presentence report, he had already been

1  convicted in state court of a drug distribution crime,

2  distribution of cocaine.  He was already under INS removal

3  proceedings, which I'm sure the Court is aware.

4  　　　　　　　He apparently went to the Dominican Republic on

5  some prior occasion -- they said he's been there a few times

6  during the time he's been in the United States -- and upon

7  coming back into the country INS picked up on the fact that he

8  was an aggravated felon because of the state proceeding.  So he

9  was already under INS removal proceedings whether or not DEA

10  investigated him or not, whether this case already happened he

11  was already in that status.  So whether or not he stays in INS

12  custody at the end of his sentence could be completely

13  unrelated to this case, although I'm sure it bolsters the INS

14  decision that he should be deported; but it could be because of

15  this other removal procedure that already preexisted the DEA

16  investigation.

17  　　　　　　　So I would suggest, your Honor, in this particular

18  case it is inappropriate to downwardly depart for that reason.

19  　　　　　　　THE COURT:  Let me take a few minutes.  I'll be

20  right back.

21  　　　　　　　THE CLERK:  All rise.

22  　　　　　　　(Recess taken.)

23  　　　　　　　THE  COURT:  Were you going to say something?

24  　　　　　　　MR. BARONE:  Yes, your Honor.  I just wanted to

25  make one other point.  My learned immigration colleague

1    indicates -- and I think it really goes to the example that

2    your Honor brought up -- that detention for my client is

3    mandatory by the INS.  An illegal alien without conviction may,

4    in fact, be eligible for bond.  So that at least in terms of

5    the example for discussion that your Honor brought up I would

6    suggest is highly relevant.

7            THE COURT:  Okay.  Anything else?

8            Okay.  I will not grant the downward departure.  I

9    have a very simple reason, and that is, I cannot believe that a

10   departure that would be applicable to innumerable defendants

11   merely because of their status is something that the guidelines

12   would count.  I'm not persuaded that the sentencing commission

13   has not taken this into account.  I don't think the departure

14   from the guidelines as a matter of law is appropriate under

15   this circumstance.  I will not grant the departure.

16           Do you want to make a recommendation, Mr. Pelgro?

17           MR. PELGRO:  Yes, your Honor.  Consistent with the

18   government's plea agreement the government is recommending a

19   sentence of 108 months incarceration, a term of supervised

20   release of five years, and a $500 special assessment.

21           The basis for the recommendation is what you've

22   heard in terms of the facts in the case, the defendant's

23   position.  He was clearly at the top of this relatively smaller

24   pyramid selling heroin of an unusually high purity, had a prior

25   conviction for drug dealing in the state court system.  The

1    government feels that 108 months followed by deportation is

2    appropriate in this case.

3           The government would also ask the Court to impose

4    as a special condition of the five-year term of supervised

5    release.  That the deportation condition -- that is, that if he

6    is deported that he not reenter without the express consent of

7    the attorney general.

8           And the question of a fine, your Honor, the

9    government had indicated in the plea agreement that it would

10   essentially let the Court determine whether he has the ability

11   or the means to pay a fine.  So that's all I'll say on that

12   particular issue.

13          THE COURT:  Okay.  Thank you very much.

14          MR. BARONE:  Your Honor, I would -- consistent with

15   what appears to be the level 29 at criminal history category

16   three note that the -- that it's indicated in the sentencing

17   table that it is 108 to 135.  I would ask that your Honor go to

18   the very lowest end of that particular line item, if you will,

19   and that would be the 108.

20          As your Honor has seen, I think, from the

21   presentence report while my client was incarcerated his father

22   passed away.  His mother suffers from a form of depression,

23   which has been exacerbated, if you will, as a result of his

24   incarceration.  He's close with his family.  He's got a child.

25   He's got the support of all his family members, and while he

1    must pay the price clearly for his conviction of the offenses

2    that are charged, I would respectfully suggest that there are

3    other factors that your Honor would talk -- speak to the low

4    end, and I would ask your Honor with respect to that to grant

5    or to sentence him to 108 months.

6              With respect to the fine, I would simply suggest,

7    your Honor, that nothing I've seen in the presentence report

8    would indicate this individual's ability to pay any significant

9    fine.  Even the -- his lifestyle during the transaction

10   occurrences that have given rise to these allegations, none of

11   that would speak to the kind of lifestyle that would grant him

12   an ability to pay a significant fine.  Certainly incarceration

13   for a substantial period of time is not going to enhance that

14   ability to pay, but certainly decrease it if not diminish it

15   completely.  So I would respectfully make those arguments on

16   behalf of my client, and I thank you for your time and

17   attention today.

18             THE COURT:  Thank you.

19             Mr. Nunez, is there anything you'd like to say

20   before sentence is imposed on you today?

21             THE DEFENDANT (Through interpreter.):  Basically --

22   first of all, I'd like to say I'm sorry, amongst of all to my

23   family, even though they couldn't be present here, because I

24   think they had to be at work.  And I ask forgiveness to the

25   government, to you, your Honor.  Thank you.

1          THE COURT:  Thank you very much.

2          Mr. Pelgro, do you see any reason why I should not

3     now impose sentence?

4          MR. PELGRO:  No, your Honor.

5          THE COURT:  Mr. Barone, do you see any reason?

6          MR. BARONE:  No, your Honor.

7          THE COURT:  Mr. Nunez, would you please stand?

8          Mr. Nunez, in accordance with the Sentencing Reform

9     Act of 1984 it's the judgment of the Court that you be

10    committed to the custody of the Bureau of Prisons for the term

11    of 108 months.  That term consists of 108 months on each count

12    to be served concurrently.

13         Upon your release from prison you'll be placed on

14    supervised release for a term of four years.  That consists of

15    four years with respect to counts one and five and three years

16    with respect to counts two, three, and four.  All such terms to

17    run concurrently.

18         Within 72 hours of your release from the custody of

19    the Bureau of Prisons you are to report in person to the

20    district in which you are released.

21         While you are on supervised release you will not

22    commit another state, federal or local crime.

23         You'll refrain from any unlawful use of a

24    controlled substance.

25         You'll submit to one drug test within 15 days of

1  your release from prison and at least two drug tests

2  thereafter.

3         In addition, you'll comply with the conditions set

4  forth in 5D1.3(C) of the guidelines, and you shall also comply

5  with the following conditions:  You are prohibited from

6  possessing a firearm or other dangerous weapon.  You are to

7  participate in a program of substance abuse as may be directed

8  by the United States probation office.  If you are ordered

9  deported from the United States you are to leave the United

10  States and you are not to return without first getting

11  permission of the Attorney General of the United States.

12         I will not impose a fine, finding particularly that

13  you do not have the resources to pay a fine, but I do order

14  that you pay the United States a special assessment of $500.

15  That $500 is due immediately.

16         Any questions?

17         MR. BARONE:  Your Honor, I would just ask that he

18  be given credit for the time he has served since --

19         THE COURT:  The Bureau of Prisons will do what is

20  appropriate in that regard.

21         Let me advise you, Mr. Nunez, that your plea

22  agreement contains a limited waiver of your appeal rights, and

23  your appeal rights with respect to the conviction -- for the

24  conviction of this offense and the sentence I've imposed upon

25  you are to be determined in accordance with your plea

1    agreement.

2                Anything further?

3                MR. PELGRO:  No, your Honor.

4                MR. BARONE:  No, your Honor.

5                THE COURT:  Thank you very much.

6                (Court adjourned at 4:15 p.m.)

7                   -  -  -  -  -  -  -

8                     CERTIFICATION

9           I certify that the foregoing is a correct

10    transcript of the record of proceedings in the above-entitled

11    matter to the best of my skill and ability.

12

13

14

15    _____        _____

16    Debra M. Joyce                  Date

17    Official Court Reporter

18

19

20

21

22

23

24

25

## CERTIFICATE OF SERVICE

I, the undersigned Theodore A. Barone, hereby certify that

a true copy of the Appendix Volume II was served on the

attorney of record for the United States, Michael Pelgro,

AUSA, United States Courthouse, 1 Courthouse Way, Suite

9200, Boston, MA in hand on May 6, 2003.

Theodore A. Barone